Good morning again. Our next case is 2020-22-20. Jennewein, or maybe it's Yennewein Biotechnologie v. ITC. Ms. Sikorsky, please proceed. Thank you. Good morning, Your Honors. My name is Nicole Sikorsky. I represent Jennewein. Ms. Sikorsky, I'm sorry to butt in right at the beginning, but I think since you have asked that the various control strains not be identified by number, I wonder if we can start off with a convention that we will identify the first control strain, the one that shows up on page 17 of the Commission's brief first on line 4 as strain A. The next one on page 17 of the Commission's brief, two lines down, as strain C. And the strain that shows up on page 36 in the footnote on line 3 of the footnote as strain B, and avoid disclosing the names of each of those strains. Does that work for you? And the others, presumably? Yes, I've got it. Thank you. Okay. All right. Go ahead. Sorry. So, starting with the negative control issue, I think there are three key points. The first is that we start with the claim language, that to establish infringement, the claim needs to measure or the test needs to measure activity of the inserted gene. That is, the claim refers to the activity of the exogenous functional gene that is in a certain level. So, that's the requirement of the claim. The second point is that there's an issue here, which is that background noise exists, that these tests can show the activity of the gene and they can also show other factors. And we have put in undisputed evidence that shows that the Miller Protocol, which is the method for doing the test, does not account for that background noise. And so, that takes me to the third point, which is, in order to prove infringement here, a strain that lacks the gene and can't show beta-galactosidase activity. Otherwise, it's not proving that the activity that it's measuring is actually the activity of the inserted gene. And I'd like to go right to the second step. I think the first step is undisputed at this point. That is a matter of what the claim requires. The language says that it has to measure the activity of the inserted gene. This is not what the ALJ said, but I understand the parties to not be disputing it at this point. And so, the second point is really... I'm sorry, this is Judge Bryson again. I wanted to clarify one thing at the outset that I found confusing. And that is, at the beginning of your summary of the argument, you say that the strains 1540 and 2410, the accused strains, do not infringe and they do not produce any beta-gal activity at all. But as I understand Dr. Parshad's testimony, she, as I understand it, testified that they do have a low level of beta-gal activity. Is your position that they lack any beta-gal activity at all? Yes. And that's based on the way that they're designed, that there are these two fragments that are inserted into the gene, and there's a temperature regulator so that one of the fragments is essentially bound up and can't express the gene until it reaches a certain temperature. So, there is not a functional gene. And your position is that there is no leakage from the temperature regulator, correct? Correct. Dr. Patterson suggested... Well, what do you do with Dr. Parshad's testimony that this 1540 does, in fact, have activity at a low level? Yes. Respectfully, I think it's Dr. Prather's testimony that's Glycosin's expert who suggested that there could be leakage. She did not do tests or anything that showed that there was leakage with respect to our strains. In particular, it was, I think, more of a hypothetical. And we don't think that the ALJ made a factual finding along those lines. And that just goes, I think, to the question of the measurement, the Miller unit activity measured of our strains, but it doesn't answer the question of whether there needs to be a negative control strain. And I think the really key, absolutely key point here is that there is undisputed evidence in the record. And I'm not talking about tests that we did. I'm talking about peer-reviewed studies and evidence from one of the co-inventors of this that you can get Miller unit readings that are within the range claimed in the patent. And that's the co-inventors' testimonies that we cited in the record that said the readings can be up to 0.2. And that's the literature that we cited from tests in Italy, in England, in the U.S. that had Miller units of, say, 1.1, 3.6, etc. And I just think this is really key because it's something that the ALJ never grappled with, this evidence. It's something that the other side, that the ITC's lawyer and that Glycosin don't grapple with in the brief now. And I understand that their argument is one that pokes holes or tries to call into question tests that Jenawein conducted and says that there are issues with those tests. But this is not an argument that depends on any of our tests at all. It depends on the fact that it's undisputed in the literature and from the co-inventor, that if you test a cell that lacks the gene and it just can't make beta-galactosidase activity, that still gives you Miller unit readings within the range. And so that means that you have to have a negative control. And once you need to have a negative control, then there can't be a finding of infringement here because it's undisputed that Glycosin did not test with a negative control. The Miller Protocol doesn't call for this sort of negative control. Is that right? That's right. But this isn't a question about what the Miller Protocol requires. It's the claim requires. The Miller Protocol is just a way to run a test, right? I understand that. I understand that. But I guess my question then becomes why-my understanding is that the claim was understood to be referencing Miller units and you measure Miller units according to the Miller Protocol. And so then the whole point of the Miller Protocol is to determine the beta-galactivity in a particular sample. So I guess the question is, why shouldn't we just follow the Miller Protocol? Because the Miller Protocol is just a way of doing the test, but it doesn't get at the question. It's just a way to measure, but it doesn't get at what- Isn't it the way to do the test? Because we're talking about Miller's units. Right. It is a test that is designed to measure beta-galactosidase activity, but the problem is at the very low levels that are claimed in the patent, this 0.05, that there is background noise. And that's why I was talking about the undisputed evidence that we put forth that background noise exists under the Miller Protocol and that it's not accounted for in the Miller Protocol. So I understand your honor's point, that the Miller test is specified in the patent, but what the patent also specifies is that the level that's measured has to be the level of the exogenous functional gene. And if it is undisputed that background noise exists with the Miller Protocol, and our evidence shows that the Miller Protocol doesn't account for it, then that is a problem with meeting the language. Let me ask you, I guess, a hypothetical. Imagine there's a patent on all shoes with a length of 9 to 11 inches, according to the King's ruler. Now, people in the King's court believe that the King's ruler is not really that precise, and maybe the markings for each inch on the King's ruler is a bit smaller than they should be, but no one's really sure about that. And the best, most accurate ruler is housed somewhere else, say, in the Department of Measurements. But because the patent is actually relying on the King's ruler as the measuring stick, then the scope of the patent right has to be defined by that reference point and not a different one. So I guess the question is, why shouldn't we be thinking of this particular patent in a similar way that it's defined the measuring stick, the Miller's Protocol? The Miller's Protocol gives us an algorithm of how to do the measurement. I understand you're saying it's not as precise as it could be or should be, but nevertheless, if that's the measuring stick, then, you know, the rules are the rules, and the ruler is the ruler. What's that thinking? Yes. We don't disfuse that Miller provides the measuring stick. The problem, I think, in your analogy is that Miller is not just measuring the shoes, but there's, say, a giant piece of gum on the back of the shoes. And the question is, are you going to account for the giant piece of gum? And so you shouldn't have a measurement that includes that because that's not the shoes. And the same thing is true in our case, that you've got, you're supposed to be measuring the beta galactosidase activity, but there's something else there. And that's what that evidence from the literature and from the co-inventor says. And so basically, for your analogy, I'd say you have to take off the piece of gum. It's the best I could come up with right now. Ms. Zaharsky, I looked at the numbers, and here's what is bothering me about your control and the numbers that are associated with it. Normally, a control, it's pretty simple. You have something that has X and Y in it. You get a certain number based on the components, the Y, and you get a smaller number. And therefore, you know what presumably the X has contributed. But the problem here that I see is the 1540 has Miller unit levels that are much smaller than the levels that are associated with strains A and B, which suggests that the control that looks like it may have been suitable is control C, which is the one that's mentioned in the email that says that control C did not show that the beta gal level was below the claimed range. Could you respond to that? And the numbers that I found were, for example, the 1540 setting out, throwing out the one high value, which you also threw out, is between 0.06 to 0.62 Miller units, and the strain A is 1.2 to 2.2, and strain B is 0.66 to 0.91, both larger than the tested levels for 1540. How do you respond to that? Sure. Two responses, Your Honor. First of all, I think these questions go to whether, not to, don't go to whether a negative control strain is used, but what would be an appropriate negative control strain. How about, and so I think, how about strain C as a negative control? Well, I think that goes, so I think that goes to the second point, Your Honor, which is that the numbers here that are being measured are at the absolute low limit of what the Miller protocol can detect. That's what the co-inventor of the patent said. And so, to the extent that these numbers are so close to each other or have some of the anomalies that you identified, I think it's because of measurement uncertainty as opposed to something else. But shouldn't we then conclude that negative controls of the sort that you've offered into measurement? I don't think that's right. Negative controls are well known. They were noted in the literature. This is something that makes sense. Of course, but there are some negative controls that just don't work because, as you suggested, they may be in an area in which the measurements are just not precise enough to give... Well, glycosid, yes. Glycosid has never proposed a different negative control. In fact, they got our negative controls and then just decided inexplicably not to use them. But I think this goes to a second question as to what negative control to use on which glycosid would have the burden of infringement and not the initial question of, do you need a negative control in the first place? And I can see that I'm in my rebuttal time, so unless the court has further questions, I'd like to reserve the remainder of my time. Yeah, just one quick question. Your preferred negative control strain, is it true that it is... The inactivating mutation and then also the... So, okay. I think the point of the negative control strain is to get it to be as close as possible and then just have the one difference be to have it lack the gene. And so, again, glycosid didn't propose an alternative negative control strain here. If I could reserve the rest of my time. We will give you three minutes of rebuttal time, Ms. Dahosky. Good morning, Your Honor. May it please the court. I'd like to first address the accused strain because I'd like to correct something that a balance counsel said that the ALJ or the commission did not make a finding as to the leakage of the temperature regulator. Actually, at Appendix 102, the commission did make specific findings and relied on Dr. Prather's testimony that these temperature regulators leak. And that was not disputed by Genoise. With respect to the negative control strain, I agree with you that with one strain, they were not able to defeat infringement. With one strain, they were able to, but the result was getting negative Miller units. I would argue that this would make the claims less definite because it is not clear what negative control strain would the parties use. And the claim language here not only requires the presence of a beta-galactosidase gene, but requires following the Miller assay. The Miller assay does not call for subtracting a negative control strain. The commission credited expert testimony that you don't do that. You don't subtract negative strains from the tested strains when you run the Miller assay. The commission did that at Appendix 111. In fact, even the literature that Genoise points to, they do side-by-side comparisons of negative strains with tested strains, but there's never a subtraction of the Miller results of one strain from another. And the glycogen expert confirmed that at Appendix 29627 and 29628. Ms. Murad, this is Judge Chen. What do you have to say about the evidence that Genoise introduced in the record that shows there are example strains in the literature where that don't have the beta-gal gene, but nevertheless produce positive Miller unit readings? And so, therefore, we should take away from that that whatever Genoines-accused strains are registering as Miller unit readings, there's some component of that is due to things that have nothing to do with a beta-gal gene. Well, to respond to your question, I have to direct you to the Miller assay itself, which points to potential sources of noise, like fermentation media, cellular debris, which has been taken care of by the parties by centrifugation, but also the reactant ONPG. There is a potential for that reactant to hydrolyze spontaneously. And the way you take that into account, as explained in Miller, is by doing an ONPG control. So, your blank has to include ONPG to account for that spontaneous hydrolysis. You do all those things, though. You take care of all those things under Miller's protocol. Is that correct? Glycogen did that in its testing, but Genoines did not. And that could explain why their negative strains have positive values. Yeah, I'm referring to the there, they identified three categories of different kinds of evidence that shows that when you undertake the Miller protocol for a sample, for a strain that doesn't contain the beta-gal gene, there are examples of when you still nevertheless get Miller unit readings. And I guess, are you trying to say that, well, you would prefer to dismiss all of these because all of these examples certainly must have failed to properly follow the Miller protocol? What we explained in the page 36 and 37 of our brief is that there is no evidence that the scientific literature was concerned with the level of precision that we were concerned with in the litigation. And so, one thing that is not evident from the literature is whether they did an ONPG control, which is what takes into account the spontaneous hydrolysis of ONPG. But as I understand it, you agree that that type of ONPG control, that's part of Miller's protocol, correct? Not necessarily, because the Miller protocol says you may want to do the ONPG control, but the scientific literature, if they're not concerned with the level of precision that we were concerned with, they may not necessarily do that. And I haven't seen that they've done that. Genuine itself, Appendix 51324, shows that their blank was just the Z-buffer. At Appendix 29699, the licensing experts expressly testified that you have to have ONPG in the blank if you want to account for the spontaneous hydrolysis of ONPG. So, there could be reasons why those negative strains generate Miller units. But glycogen showed by a preponderance of the evidence that the Miller units were beta-galactosidase activity, because there was no evidence that any other gene could cause beta-galactosidase activity. Even genuine experts admitted to that at Appendix 29822. As to other sources of noise, glycogen testing accounted for that. They did the centrifugation to account for fermentation media and cellular debris, and they followed the ONPG control that was called for in the Miller assay. And actually, the commission specifically found that genuine ONPG control was flawed because it included cells when it was not supposed to. And I'd like to also point to here, it is undisputed that the Miller protocol does not disclose the use of a negative control strain. The commission credited expert testimony by glycogen. You don't subtract the negative control strain from the tested strain. That is Appendix 111 citing Appendix 33983. So there was substantial evidence to support the commission's determination. And certainly, the court should not allow Genwine to escape substantial evidence standard by arguing that this is a claim construction dispute. It is not. The issue concerns the proper testing methodology, and it is squarely factual in nature. And furthermore, Genwine never presented this issue to the commission as a matter of claim construction, and the court should not allow them to do that on appeal. If there are no further questions, I'll conclude my argument, and thank you, Leon. One of the accused strains was found by the commission to be not infringing the claims. Is that right? Both accused... Actually, yes, Your Honor. I see what you're... To the TTF-CAL12 strain, correct? Yes. Yes. That strain was found to lack a functional beta-gadactyl-cdase gene, and so it was found not to infringe. In addition, I know that Genwine went to customs and further had a ruling from them that the 1242 strain also was found to be non-infringing for the same reasons as TTF-CAL12, and the 1242 strain has FDA approval. Thank you, counsel. Let's hear from Mr. Newman. Thank you. Mr. Newman, are you there? Thank you, Your Honors, and may it please the court. I'd like to go right to the issue of background noise and note that Miller has two different procedures, one for testing high levels of beta-galactosidase and one for testing low levels. When testing for low levels, there's the ONPG step and not for high levels, and the articles that Genwine points to that are showing background noise are tests that are testing for beta-galactosidase activity up to 20,000 units, and so these tests are not interested whatsoever at the low levels of beta-galactosidase, and I think it can be presumed that those do not include the standard controls that you would use in the Miller protocol for testing low levels of beta-galactosidase activity. I would also take a bit of an exception to Genwine stating that it's undisputed that the beta-galactosidase activity needs to be attributed to the beta-galactosidase gene that was inserted. Genwine's pre-hearing brief was clear that the claim required measuring the strains beta-galactosidase activity, and specifically they said the units must reflect the beta-galactosidase activity of the bacterium. Genwine's expert also testified along the same lines that the asserted claims required the measured units reflect beta-galactosidase activity of the E. coli bacterium, opposed to the gene itself. That's at Appendix 60658. During the Markman proceedings, Genwine contended that the Miller units must be measured by strictly adhering to the Miller assay. For example, at Appendix 204, Genwine faulted glycosin for wanting to adopt the Miller assay, the method of calculating units, but not the expressed description of how the assay should be performed. So over and over again, Genwine took the position that the Miller test needed to be performed to the letter of Miller as described in the Miller assay. And so the first we heard of the idea that the activity needed to be corresponding to the gene that was inserted was in the post-hearing brief, and therefore, I mean, I think there argument is waived under Broadcom court. But regardless, even if the claim did require that the activity be attributable to the inserted beta-galactosidase gene, the ALJ found that it did. In Appendix 106, the ALJ found that the limitation was still met, since the strain produced beta-galactosidase activity in the range and no other source of beta-galactosidase activity other than the functional beta-galactosidase gene must identify. There was a finding of fact that Miller units from glycosin tests were beta-galactosidase activity. That's Appendix 116, 117. There was a finding of fact that the only known source of beta-galactosidase in the accused strain was the inserted beta-galactosidase gene. That's Appendix 109. There was a finding of fact that repressors leak. That's Appendix 102. And there was a finding of fact that Yenivine's tests were not credible and were not reliable That's at Appendix 106, Appendix 116. Mr. Newman, you were saying that Miller uses ONTG controls for low levels of activity, but not high levels of activity, and then GenY's cited literature deals with cases of high levels of activity. Is that right? Did I understand you correctly? Where in the record do you have evidence of all this? At Appendix 53964, you can see that the test being performed is for a plasmid that includes the beta-galactosidase gene that expresses Miller units at 20,000 Miller units. It would have been helpful if this issue had been briefed on your side. I didn't see anything in the briefs that raised the issue you've raised here at argument. Did I miss something? I think that I guess I don't remember, Your Honor, exactly if we Well, I don't remember it either. And I read the brief several times. So I don't think there's anything at least as explicit as what you're saying now about the problem with the literature. Yes, Your Honor. It very well may be that this is in response to the reply brief that we got. Anything further, Mr. Newman? No, Your Honor, unless there are any questions. Thank you, Ms. Zukosky has some rebuttal time. We'll give you three minutes. Thank you, Your Honors. I'd like to start with the negative control strain issue. And first, I'd like to start with, I think, a question Judge Chen asked. I'm afraid I misunderstood that question and gave the wrong answer. So I want to correct that. I think the question was whether the strains we used had the limitations Romanet 3 and Romanet 4 in the patents. And the strains did not. I just checked the record on that. I'd say that glycosin never provided a different negative control. In fact, they had planned to use our negative control and then inexplicably decided not to use it. And I think the question here is what the claim requires. Does it require a negative control? Not exactly how should the test be run or what is the right negative control? And now glycosin is coming in and saying the claim doesn't even require use of or measuring the activity of the gene. But that comes right from the claim language. It says that there's an exogenous functional gene comprising a certain level of activity. And that's what needs to be measured. I guess the second point would be this evidence that we talked about, and I'm happy that the court has looked closely at it, this evidence in the literature from Italy, from the UK, and from the US. These are three different sets of tests, more than one test in each one, peer-reviewed to talk about there being Miller unit activity for cells that completely lack the gene. And there's this new attempt by glycosin, an argument that wasn't in any of the briefs about, oh, these are just for high levels. But that's not, I would take a look at this literature. That's not what it says. And plus, there's still the other evidence of the co-inventor of this very patent that said that he tested bacterium that didn't have the gene and got up to 0.2 Miller units, which is well within the level of activity here. And I guess I understand the arguments that the ITC and the glycosin are making about, the ALJ found some issues with the way that Yenawine conducted its tests. But I would say you can put all that evidence aside, all of the evidence of how Yenawine conducted its tests, and you still have this evidence from the literature and from the co-inventor of the patent. And by the way, to the extent that there are criticisms of how we conducted our tests, Yenawine also conducted tests of the negative control following glycosin's protocol exactly to the letter and found Miller unit readings for a cell that lacks the gene of up to 2.24 units. And the point, Your Honors, is that this negative control really matters because our strains don't have the ability to make beta-galactosidase activity. Everything that's being reported is just this background noise. And we're talking about the absolute lowest limits of what can be detected in the Miller protocol. And I would also just point, Your Honors, to our other arguments related to the fact that there's not an exogenous functional gene here because it's only part of it that's exogenous and the timing issue. The long and short of it here is that what our strains do is just not what's claimed in the patent. And Yenawine or glycosin is trying to stretch and stretch and stretch the terms of this patent to try to get it covered. But it's fundamentally different because we just don't have the genes that are functional during this process. So we respectfully urge that you reverse the decision of the ITC. Could I ask just a purely procedural question? There are a couple of citations in the appendix. Well, they're in your briefs to things in the appendix that I found missing. You cite, and I think this is on about pages 39 to 40 or so of your opening brief, you cite pages 48-38, I think it is, and 54-368, both of which are blank pages. They're followed by a gap in the appendix, which I assume was, these are Yenawine's test results, but I assume those were intended to be the inclusion of the test results from Yenawine. Should we have those or what is the story with those citations? Your Honor, I'm going to need to take a look at those citations. I think you'll find that the page is indicated placeholder. And there's nothing, there's a skip which appears just to be material that was either intentionally or unintentionally omitted. Yes, Your Honor. We will take a look at that and then update the court as appropriate. Thank you. Ms. Saharsky, I've got a procedural question, too. Your 1242 strain has received FDA approval. How about your TTFL strain? I think so, but I don't have that in front of me, Your Honor, to double check. I wonder why are we here other than perhaps damages? Sorry, Your Honor. We provided the NATO's Excel files through USB drives on the other sites that Your Honor was asking about. I think it was Judge Bryson. I'm sorry, just to clarify this. This is 48038, 54368, et cetera. Those were provided to the court through USB drives. So they're not in paper, but they were provided in that way. Yeah, for a person that uses paper, relies on paper, that puts me at something of a disadvantage, but thank you. Yeah, sorry about that confusion. If you could let us know about the FDA approval status of TTFL, I'd appreciate it, in a short letter. Yes, will do, Your Honor. I'm sorry, I just want to double check that I don't want to misspeak. Thank you. Anything further? If not, the case is taken under submission. Thank you to both counsel. The Honorable Court is adjourned until tomorrow morning at 10 a.m.